[Cite as *State v. Flow*, 2022-Ohio-4416.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICTW
LUCAS COUNTY

State of Ohio                                            Court of Appeals No.  L-21-1212

    Appellee/Cross-Appellant               Trial Court No.  CR0202001605

v.

Secarr Flow                                             **DECISION AND JUDGMENT**

    Appellant/Cross-Appellee               Decided:  December 9, 2022

* * * * *

Julia R. Bates, LucasCounty Prosecuting Attorney, and
Evy M. Jarrett, Chief Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**DUHART, P.J.**

{¶ 1} Appellant, Secarr Flow, appeals from a judgment entered by the Lucas

County Court of Common Please, sentencing him for one count of complicity in the

commission of murder and for two counts of complicity in the commission of felonious

assault.  Appellee, the State of Ohio, filed a cross-appeal from the same judgment.  For

the reasons that follow, we affirm in part and reverse in part the judgment of the trial

court. We remand the case to the trial court so that a minimum and maximum term can be imposed for the second count of felonious assault in accordance with R.C. 2929.14(A)(2) and so that an aggregate sentencing range can be determined and imposed by the trial court in accordance with R.C. 2929.144.

## Statement of the Case

{¶ 2} Appellant was one of three people who were accused of planning and executing an armed robbery of a man who sold marijuana. The armed robbery took place on July 9, 2019, while the seller ("Seller") was seated in a car, along with the driver ("Driver") and the driver's boyfriend ("Boyfriend"). Although Seller was not injured, both of his companions were shot, resulting in the partial paralysis of Driver and the death of Boyfriend.

### Indictments

{¶ 3} On April 16, 2020, appellant was indicted on a charge of murder in violation of R.C. 2903.02(A) and 2929.02, and on an alternative charge of murder in violation of R.C. 2903.02(B) and 2929.02. He was also charged with one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), and with three counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D). All of the charges carried a firearm specification pursuant to R.C. 2941.145(A), (B), (C), and (F). Lastly, appellant was charged with one count of participating in a criminal gang in violation of R.C. 2923.42(A) and (B).

2

**{¶ 4}** Dai Johntae King was also charged with crimes related to the incident, and the charges against both men were tried together. The third individual who was involved in the offenses, "Juvenile B.M.," was the subject of juvenile court proceedings, and he testified for the state at the trial for the other two defendants.

**Consolidation and severance of the gang participation charge**

**{¶ 5}** Appellant moved to sever the gang participation charge from the other charges, a few weeks before trial. On the morning of trial, just prior to jury selection, the trial court granted the motion, concluding that joinder was not appropriate pursuant to Crim.R. 8(A). The court observed that the felonious assault and murder charges arose from a single incident that took place on July 9, 2019, while the gang participation charge involved activity alleged to have taken place over the course of a five-year period, beginning on April 16, 2015 and ending on April 16, 2020. The court found no evidence that the gang charge met the requirements of Crim.R. 8(A) for joinder with the remaining charges related to the July 9, 2019 shooting.

**Objections and ruling on gang evidence**

**{¶ 6}** Immediately after severing the gang charge, the trial court clarified to counsel that the severance did "not mean that any and all testimony regarding gang affiliation or gang activity [would be] summarily barred from presentation throughout the course of [the] trial," and that "gang affiliation can be relevant in cases in which the interrelationship between people is a central issue." The trial court stated that any

objections to gang testimony would be addressed as they arose over the course of the trial.

{¶ 7} Appellant's counsel raised the first such objection during the state's examination of Juvenile B.M., when the prosecutor asked Juvenile B.M. whether he, appellant, and a third individual, Davion Johnson, belonged to the same group, and what group that was. The basis for the objection was that evidence related to gangs was "propensity evidence" whose prejudicial effect would outweigh any probative value.

{¶ 8} A lengthy discussion about the admissibility of such evidence ensued, with the prosecutor stating that she had purposely used the generic term "group," rather than "gang," during her questioning of the witness, and that she intended to ask the witness to identify King and appellant's social media profiles without any reference to gang affiliation in order to show the connections among appellant, King, and Juvenile B.M. The prosecutor also said that she intended to ask Detective Nicholas Bocik of the Toledo Police gang task force about the association of the three young men and to introduce evidence of their social media posts in order to corroborate certain testimony by Seller. Finally, the prosecutor said that testimony regarding the recovery of a firearm linked to the charged crimes would involve testimony about the relationship between appellant and King with Davion Johnson and a fourth individual, Tyon Hughes. The prosecutor stated that she did not intend to offer evidence of prior convictions or other prior criminal acts, except for some information regarding a shooting at the home of appellant's mother.

4

{¶ 9} The trial court concluded that the proposed evidence of gang association was relevant to show a relationship between the defendants, to provide background information in order to explain how the witness and the defendants knew each other, and to provide context regarding the defendants' role in committing the crimes. The gang evidence was also determined to be relevant to show a common purpose in connection with appellant's prosecution under a complicity theory. The court then found that the evidence was not unduly prejudicial, and that any prejudicial effect had been minimized by severance of the gang charge. The court ruled that the prosecution could not introduce evidence regarding prior convictions of appellant or King unless they testified. In addition, the state would not be permitted to introduce expert testimony regarding the specifics of the gang in question -- namely, "SG the Family" -- "or any other evidence designated for purposes of proving the participating in a criminal gang." However, the court said that a detective with the gang task force would be permitted to testify that SG the Family is a known criminal street gang.

{¶ 10} Appellant's counsel renewed his objection to all testimony related to "SG the Family" before the detective testified. He also objected to one of the photos that King's attorney sought to introduce, depicting King's bare torso, on the grounds that the tattoos that were visible in the photo could be used as a factor suggestive of gang activity. The state acknowledged that the gang task force detective might testify that tattoos could sometimes be indicators of gang membership, and that some of the tattoos might be a method by which Detective Bocik identified appellant as a member of SG the Family.

5

However, the prosecutor said that the state did not intend to introduce photos of gang-related tattoos.

**Acquittal of the gang charge**

{¶ 11} Appellant waived his right to a jury trial with respect to the gang charge. Although the trial transcript does not include the transcript of the bench trial, the court apparently heard the evidence related to the gang charge while the jury deliberated on the remaining charges. The court announced at sentencing appellant's acquittal of the gang participation charge.

**Convictions**

{¶ 12} Appellant was convicted on one count of complicity in the commission of murder in violation of R.C. 2923.03(A) and R.C. 2903.02(B) (felony murder), one count of complicity in the commission of aggravated robbery, and three counts of complicity in the commission of felonious assault. All of the counts carried three-year firearm specifications.

**Sentencing**

{¶ 13} At sentencing, the trial court treated the conviction for complicity in the commission of aggravated robbery and one conviction for complicity in the commission of felonious assault as merged into the count for complicity in the commission of murder. The state elected to proceed to sentencing on the count of complicity to murder.

{¶ 14} The court sentenced appellant to 15 years to life for the murder charge. For the charge of felonious assault of Driver, the court imposed a minimum term of eight

6

years with a maximum term of 12 years. For the charge of felonious assault of Seller, the court imposed a term of four years. The court also imposed the applicable three-year terms for each of the firearm specifications.

## Statement of the Facts

{¶ 15} Evidence of the following was adduced at trial.

**The shooting**

{¶ 16} On July 9, 2019, Driver was with Boyfriend when Boyfriend's friend, Seller, wanted to go make a sale. Although Seller did not mention what he intended to sell, Driver drove Boyfriend and Seller, in Driver's white Impala, to the address where the sale was arranged to take place. When they arrived at their destination, Driver stopped the car. She had not yet put the car in park, when she looked over to the right rear passenger window and saw that one man had a gun pointed toward the back of Boyfriend's head, while another man had a gun pointed at her.

{¶ 17} Seller initially said, "[I]t's cool, it's cool, I know them." But then he said, "[G]o, just go." When Driver hit the gas, she heard a gunshot and realized that she had been hit. The car was still moving, but it began to slow as her legs gradually went numb. She saw that Boyfriend had a bullet hole in his neck. She started to scream, and the car came to a stop because she could not move her legs. Seller got out of the back seat, pushed Driver over into Boyfriend's lap, and drove the car to the hospital.

{¶ 18} The bullet lodged in Driver's left flank area and caused her to be paralyzed from the hips down. Although she had begun to regain some movement at the time of

7

trial, she testified that she remained completely paralyzed from the knees down and was in constant pain due to her injuries.

{¶ 19} A bullet entered the far right side of Boyfriend's neck and exited under the left side of his jaw. He suffered a fracture of the C-2 vertebra, which paralyzed him, leaving him incapable of breathing on his own or controlling his bowel or bladder functions. On February 11, 2020, he died as a result of complications from the gunshot wound.

{¶ 20} Driver could not remember the faces of the gunmen, but she said that she recalled that they had dreadlocks tipped in a gold color. Because both men had dark skin, she said they looked to her like "twins."

{¶ 21} Driver was experienced with guns and said that the shots sounded like a "40 or a 45." She thought that bullet that struck her was the same one that had struck her boyfriend.

**The 911 call**

{¶ 22} On July 9, 2019, at 8:55, witness Chris Schlachter called 911 and reported that shots had been fired on the 1600 block of Lawnview. He said that two young black males, about 16 to 20 years old, had approached a white car, after which Schlachter heard "bang-bang-bang." Both males carried handguns, and Schlachter saw one of them pick a gun up off of the ground. One of the suspects was wearing jeans and maybe a bandana, and one was not wearing a shirt. Schlachter had seen the two young men earlier as they were walking down the street.

8

**Crime scene investigation**

{¶ 23} Officers responding to the 911 call located a bag of marijuana and a spent shell casing between the sidewalk and curb area in front of 1602 Lawnview.  They also procured a Ring doorbell video from neighboring 1526 Lawnview, which is located just south of 1602 Lawnview.  The video depicted a black male with a short, flat-top hairstyle stepping in front of 1526 Lawnview and then immediately stepping out of view of the camera.  The video also depicted two individuals working in the front yard of a house across the street.

**Investigation of the car**

{¶ 24} While responding officers were still at the scene of the shooting, an officer at Toledo Hospital called to report a walk-in patient with a gunshot wound.  Officers arrived at the hospital and saw a white Impala parked outside the ER.  The car had a broken window, an open door, and blood "coming from the vehicle."  Officers spoke briefly with Seller, who had driven the Impala to the hospital with two injured and unconscious passengers inside.

{¶ 25} After securing the car, police discovered that the Impala had a bullet defect in the driver's side rear bumper, in an area below the taillight. The defect's circular shape suggested a gunshot straight into the vehicle from behind.  Paint was still clinging to the edges of the defect, even though paint is typically fragile.  A bullet was recovered from the inside of trunk, near the area of the taillight.

{¶ 26} Another defect, low on the driver's side door, appeared to have been caused by a bullet ricochet. There was no rust around the defect, despite the fact that rust develops rapidly, often in as little as a day or two.

{¶ 27} Still another bullet had traveled from outside, through the passenger's side C-pillar, located at the rear of the passenger compartment, and into the passenger compartment of the vehicle. Once inside, the bullet crossed in front of the rear driver's side seat, and finally lodged in the adjacent shoulder harness assembly. According to Toledo Police Detective Jeffrey Jackson, anyone seated in a normal position when the shot was fired most likely would have been struck.

{¶ 28} The passenger's side of the vehicle was processed for palm prints and fingerprints, and most of the usable prints were identified as belonging to Seller. King was eliminated as the source of palm prints, and several other prints were insufficient for comparison.

**The Schlachters' trial testimony**

{¶ 29} Teenage witness Harrison Schlachter testified that he was positioned across from the stopped car, mowing the front yard of a house, when he looked up and saw two men pointing handguns at the car. He said that both males were African American, and that they were probably in their teens or early 20's. He heard two or more shots, but could not be sure whether it was one or both men who fired them. Following the shooting, the men ran off "between the houses."

10

{¶ 30} Harrison's father, Christopher Schlachter, was in the driveway of 1525 Lawnview when he saw a car pull up and saw two males walk over to it. He said that earlier that evening he had passed the two men on the sidewalk, one block away. He heard three or four shots, which he initially thought might have been fireworks, and then he saw a man reach down and pick up a gun before running off. He said that both men were younger black males. He thought that one of the men might have worn a bandana or "something" on his head.

**Seller's trial testimony**

{¶ 31} Seller testified that he had sold marijuana four or five times to appellant, whom Seller knew as "Screw." Appellant called Seller on July 9 and asked to buy seven grams of marijuana, but at the time Seller only had a couple of grams left to sell. After three phone calls, Seller agreed to sell the marijuana he did have. The sale was initially supposed to take place at Oakwood Gardens, but then appellant told Seller to come to appellant's grandmother's house on Lawnview, which had been a previous location for sales between the two. Seller was with Driver and Driver's boyfriend. They all got into Driver's white Impala to take Seller the location of the sale. Seller was seated in the car behind Driver, and Seller believed the window on his side of the car was closed. The right rear passenger's side window was open.

{¶ 32} When the car pulled up, Seller saw two young black males on the sidewalk. They walked up to the car, both meeting at the back window on the passenger's side. One man was skinny and the other was shorter and "a little more built." The taller one

11

had some little dreadlocks and the other had a "cut," but not a lot of hair. The taller man had a Hi-Point firearm, maybe a 9mm, and the shorter man, King, had a 40 caliber gun with a beam on it.

{¶ 33} One of the men said "[G]ive me everything," and Seller threw a bag of weed, saying "Here, you can have this." When the man then said, "run your pockets," Seller told the driver to "pull off." Seller saw a green beam from a gun "across [his] eye," and he ducked as the shooting started. Seller said that the shorter man, King, fired the first shot, but that the other man also fired his gun.

{¶ 34} Seller testified that when he spoke with police at the hospital, he did not admit that he went to Lawnview to sell marijuana, and he did not identify appellant as the intended purchaser. Instead, Seller made up a story that he and his companions had pulled to the side of the road to look for an address, when two guys came up to rob them. Seller said that he initially lied to police because he intended to take revenge for the incident himself. When he subsequently realized that investigators had other information about the crime, he gave the detective the phone number that appellant used to contact him. He also provided the detective with a photo depicting appellant and King. Seller had found the photo on Facebook and had given it to his "people" for purposes of getting revenge. When asked to review a photo array, Seller identified King.

**Juvenile B.M.'s testimony**

{¶ 35} Juvenile B.M. testified that he is in the custody of the Department of Youth Services until he turns 21, as a result of adjudications on delinquency complaints for

12

murder, felonious assault, robbery, and three firearm specifications, all related to the events of July 9, 2019. He admitted to committing the offenses in exchange for an agreement that the state would not pursue certification of him for prosecution as an adult. He identified the proffer agreement and testified that he was obligated to tell the truth and that any lies could result in the proffer being used against him at a trial or other hearing.

{¶ 36} Juvenile B.M. said he knew King as "Dailow," and that King "used to always like just be around." Juvenile B.M. identified appellant as his cousin, and said that their grandmother lives at 1602 Lawnview. Another cousin, known to Juvenile B.M. as "BigLoyal Bang," introduced Juvenile B.M. to King. According to Juvenile B.M., they all hung out together and they all belonged to the same group, known as "SG the Family." Juvenile B.M. identified his own Facebook profile along with that belonging to King, and another belonging to appellant. King's used the profile name "Dailow Staylow," and appellant used the profile name, "Screwedup Nutz." Juvenile B.M. described his relationship with appellant as "very close."

{¶ 37} Juvenile B.M. met King in 2019, and he stated that they had been around each other "ten or more times." On July 9, 2019, Juvenile B.M., King, and appellant had played basketball together. Eventually, appellant decided that he wanted some weed. None of them had money, but appellant said that he knew somebody they could rob who would not have a gun or "a lot of people." Juvenile B.M. testified that appellant gave him a 9mm gun with a laser. King already had a Hi-Point 40, which Juvenile B.M. had seen before.

13

**{¶ 38}** According to Juvenile B.M., appellant handed his phone over to King, and then Juvenile B.M. and King went into the back yard to wait for Seller's arrival while appellant waited around the corner. When the Seller called appellant's phone, Juvenile B.M. and King walked up to the car. Juvenile B.M. first walked up to the car's driver's side, and then went around to rear window of the passenger side, where he met King. Both he and King put their guns in the window, at which point the man in the back seat "just automatically threw the weed out the window." The car started pulling off and then King started shooting. Juvenile B.M. denied firing his gun. He said that he and King ran toward the area where appellant was parked and waiting, but that as King started to run, he lost a slip-on shoe. Juvenile B.M. picked up the shoe. Juvenile B.M. met up with appellant at his car and got in. Appellant dropped him off, and Juvenile B.M. left the 9mm gun in the car when he got out.

**{¶ 39}** Juvenile B.M. admitted that he had spent the previous day with appellant and King, and that they had run from police. His brother had given him a gun, which he tossed away as they ran.

**{¶ 40}** Juvenile B.M. identified King in a photo array, as well as in a photo with BigLoyal Bang. Juvenile B.M. also identified himself as appearing in the neighbor's Ring video recording. He acknowledged that his hair was standing high in the video because he had some "twisties" in it.

**Recovery of the firearm**

14

{¶ 41} Sergeant Ryan Babcock testified that on August 9, 2019, he was asked to locate Davion Johnson and Tyon Hughes in a silver Dodge Avenger, because the two men were suspected of planning to commit a shooting from the vehicle. Sergeant Babcock and his partner made a traffic stop of the vehicle. The occupants of the vehicle were very nervous, and one kept looking at the floor as his chest heaved. When the driver, Davion Johnson, was removed from the car, a 9mm Taurus firearm fell to the ground. A Hi-Point pistol was subsequently discovered under Tyon Hughes' seat.

**Comparison of casings and projectiles to the firearm**

{¶ 42} The shell casing that was recovered at the scene of the shooting was compared to the Hi-Point model JCP 40 caliber pistol that was retrieved from under Hughes' seat, and firearms examiner David Cogan concluded that the casing was, in fact, fired from the same High-Point pistol. Although both the projectile recovered from the shoulder belt assembly and the projectile retrieved from Driver's body had rifling characteristics consistent with a Hi-Point model JCP 40 caliber pistol, it was determined that neither was fired from the gun that was found beneath Hughes' seat. The projectile removed from the trunk was also not fired from the gun associated with Hughes. That projectile was consistent with a 9 millimeter or 357 caliber projectile.

{¶ 43} The projectile removed from Driver's body was compared to the projectile recovered from the shoulder belt assembly, and it was determined to be "inconclusive" as to whether they were fired from the same firearm. The projectile removed from Driver's body was also compared to the projectile that was removed from the trunk, and it was

15

determined that those two projectiles were not fired from the same firearm. Based on the totality of his findings, Cogan concluded that "most likely" two 40-caliber guns were used at the scene.

**Seller's pretrial interviews**

{¶ 44} Sergeant Roy Kennedy testified that he and Detective Danielle Mooney first interviewed Seller on the date of the incident. Soon after, Seller's father contacted Detective Mooney and provided her with a photo of appellant and King. Detective Mooney immediately recognized appellant in the photo. Members of the gang task force assisted her in identifying King.

{¶ 45} During the second interview with Seller, which took place on July 18, 2019, Seller provided Detective Mooney with appellant's phone number. Detective Mooney was subsequently able to verify several contacts between Seller's phone and appellant's phone that had been made on July 9, 2019. In addition, Seller viewed a photo array and identified King.

{¶ 46} In February 2020, Seller did not identify Juvenile B.M. when presented with a folder line-up.

**SG the Family**

{¶ 47} Detective Bocik testified that he investigated SG the Family, a Toledo gang with approximately 20 members. As part of that investigation Detective Bocik learned that King was associated with appellant, Juvenile B.M., Davion "BigLoyal Bang" Johnson, and Tyon Hughes, through SG the Family.

16

{¶ 48} Detective Bockik said that Juvenile B.M. posted a picture on his Facebook page captioned "hashtag LLB free my brotha." A video posted on Juvenile B.M.'s account depicted himself, appellant, and King.

{¶ 49} King's Facebook page, "Dailow Staylow," included a photo of himself making a sign with his hand while wearing an SG the Family shirt and a red bandana. Davion Johnson was also depicted in the photo. Another photo depicted appellant, King, and Johnson at 539 East Stryker, an address associated with both Johnson and Hughes.

{¶ 50} Appellant's Facebook page, "Screwedup Nutz," included a photo of appellant with King, Johnson, and Hughes. Another post depicted a flier for a concert with SG the Family as the presenting artist, and the photo on the flier depicted King, appellant, Johnson, and Hughes. Finally, a still photo of a posted video depicted Juvenile B.M., appellant, King, and Johnson.

### Assignments of Error

{¶ 51} Appellant asserts the following assignments of error on appeal:

I. The trial court's judgment entry does not comply with the requirements of R.C. 2929.144(A)(B)(2) under the Reagan Tokes Act.

II. The trial court abused its discretion and erred to the prejudice of Appellant by allowing the State to introduce 404(B) evidence of Appellant's alleged participation in a criminal gang.

III. The trial court erred in denying Appellant's Crim.R. 29 motion.

17

IV. The jury's verdict was against the manifest weight of the evidence presented at trial.

### Analysis

{¶ 52} Appellant argues in his first assignment of error that the trial court's judgment entry does not comply with the requirements of R.C. 2929.144(B)(2) under the Reagan Tokes Law. The Reagan Tokes Law provides that a sentence for a felony of the second degree "shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code," except when the statute defining the offense requires a different minimum term. R.C. 2929.14(A)(2). When the court imposes a sentence for more than one felony:

> * * * the court shall add all of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree that are to be served consecutively and all of the definite terms of the felonies that are not qualifying felonies of the first or second degree that are to be served consecutively, and the maximum term shall be equal to the total of those terms so added by the court plus fifty per cent of the longest minimum term or definite terms for the most serious felony being sentenced.

R.C. 2929.144(B)(2).

18

{¶ 53} In the instant case, appellant was convicted for two counts of felonious assault, both second degree felony offenses which are subject to the provisions of the Reagan Tokes Law. For one of those convictions, the trial court properly imposed a minimum term of eight years up to a maximum of 12 years. For the second conviction, however, the court imposed a flat term of four years. As R.C. 2929.14(A)(2) requires imposition of a minimum and a maximum term for a felony of the second degree committed after the effective date of the Reagan Tokes Law, this matter will be remanded to correct appellant's sentence in accordance with the statute.

{¶ 54} Appellant points out that the trial court failed to include in its original sentencing entry an aggregate minimum and maximum sentencing range. Pursuant to R.C. 2929.144(B)(2), a sentencing court must first add all of the consecutively imposed terms, in order to determine the aggregate minimum term, and then it must compute the maximum aggregate term. *State v. Martinez*, 6th Dist. Lucas No. L-21-1020, 2021-Ohio-3994, ¶ 33-36. R.C. 2929.144(C) provides that the stated minimum term and the calculated maximum term must be imposed at sentencing and, further, must be included in the sentencing entry. *See Martinez* at ¶ 37-38 (case remanded so aggregate sentencing range could be determined and imposed by the trial court); *State v. Searles,* 2022-Ohio-858, 186 N.E.3d 328 (2d Dist.) (holding that both the stated minimum term and the calculated maximum term must be included in the sentencing entry).

{¶ 55} Because the record reflects that the trial court failed to sentence appellant in accordance with R.C. 2929.14(A)(2) with respect to one of the two counts of felonious

19

assault, and because the sentencing entry failed to include a stated minimum and calculated maximum term in accordance with R.C. 2929.144(C), we find appellant's first assignment of error well-taken. [1]

{¶ 56} Appellant argues in his second assignment of error that the trial court abused its discretion and erred to the prejudice of appellant by allowing the state to introduce evidence of appellant's participation in a gang. Specifically, appellant alleges: (1) that the state failed to provide notice of its intent to use such evidence under Evid. R. 404(B); and (2) that the trial court erred in admitting the evidence, after it had previously ruled that gang-related evidence was, by its very nature, unfairly prejudicial to appellant.

{¶ 57} Admission of evidence rests within the sound discretion of the trial court, and a reviewing court will not reverse absent an abuse of discretion. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

---

[1] The state asserts in its brief that its cross-appeal "was intended to raise the same issue" that was asserted in appellant's first assignment of error and that it incorporated by reference into the cross-appeal the state's analysis of appellant's first assignment of error. In light of our decision with respect to appellant's first assignment of error, we find appellee's cross-appeal to be well taken.

{¶ 58} Evid. R. 404 addresses the use of evidenced of other crimes, wrongs or acts. Although other acts evidence is inadmissible to show a defendant's allegedly bad character, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of intent." Evid.R. 404(B).

{¶ 59} Evid. R. 404 requires that the proponent of other acts evidence provide reasonable notice in advance of trial, or during trial if the court excuses the lack of pretrial notice for good cause. Evid.R. 404(B)(2). The purpose of the notice provision is to prevent unfair surprise. *See State v. Plevyak*, 11th Dist. Trumbull No. 2013-T-0051, 2014-Ohio-2889, ¶ 22. "Whether notice is 'reasonable' will depend on the facts and circumstances of each case." *Id.* at 19. In addition, absent a showing of bad faith, the notice provision of Evid.R. 404 should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice. *Id.* at ¶ 21.

{¶ 60} In the instant case, appellant observes that there is nothing in the record to indicate either that defense counsel had reasonable pretrial notice of the state's intention to introduce evidence of appellant's association with a gang or that the trial court excused the lack of such notice. As explanation for this apparent failure, the state argues that because the gang participation charge -- pursuant to which the gang-related evidence would have been admitted -- was part of the indictment scheduled for trial, and because the motion to sever was not granted until the first day of trial, the need to provide notice in advance of trial was simply not expected in this case. Given the unique circumstances

21

with which the prosecution was faced, we are not prepared to find that the state's failure to provide pretrial notice of its intent to use Evid.R. 404(B) evidence was the result of bad faith. In addition, because appellant's counsel was fully aware of the gang participation charge, as indicated by the indictment and by discovery, appellant cannot demonstrate either unfair surprise or prejudice resulting from the lack of notice. Any error resulting from the alleged failure was harmless and, thus, does not constitute grounds for reversal. *See Plevyak; see also State v. Stuits*, 6th Dist. Lucas No. L-18-1036, 2019-Ohio-657, ¶ 42-45.

{¶ 61} Next, we turn to appellant's claim that the trial court abused its discretion by allowing into evidence references to appellant's membership in "SG the Family," and that admission of such evidence violated Evid.R. 404(B). The basis of appellant's claimed error is his contention that "the court had previously ruled that gang-related evidence was, by its very nature, unfairly prejudicial to Appellant." In fact, the trial court had previously ruled only that the gang participation charge was not properly joined to the remaining claims.

{¶ 62} Ohio's gang participation charge requires proof of a gang's "pattern of criminal gang activity," which, in turn, requires a demonstration of certain crimes committed within a certain timeframe. *See* R.C. 2923.42; R.C. 2923.41(A) and (B). In ruling on the severance issue, the trial court looked first to Crim.R. 8(A), which requires for joinder either charges of similar character or some connection between the charges. Specifically, Crim.R. 8(A) provides:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

The trial court found that the state did not demonstrate that the gang participation charge met the requirements for joinder with the remaining charges, stating:

In the first six counts of the indictment we have one incident, one date, a course of events that happened in what is described as a short period of time, a plan to commit a robbery is hatched. A robbery is committed. That robbery led to a shooting which ends in a death and an injured victim, and the alleged shooter and his conspirators fleeing. * * * This all occurred on July 9th of 2019.

Conversely, Count 7 of the indictment, the charge of participating in a criminal gang, includes a 5-year time span, stretches from April 16th, 2015 through April 16 of 2020 and seeks to prove the active gang participation of defendants Secarr Flow and Dai'Jontae King. * * * There has been no evidence presented to the court that the gang charge is of the same or similar nature to the murder, aggravated robbery, or felonious assault charged. There's nothing contained in the state's brief to indicate so,

there's been no testimony proffered from any of the state's witnesses indicating as such. There's been no evidence presented to this court that the offenses are connected or constitute part of a common scheme or plan, nor has the court heard any evidence that these charges are part of a course of criminal conduct. There is nothing in the record to indicate that the defendants' alleged active gang participation was connected to the alleged robbery, murder, and felonious assault that occurred on July 9th of 2019. I've heard nothing to indicate that this was done in the furtherance of a criminal gang, that any proceeds went back to support the criminal gang, that the targets of this robbery were rival gang members, or that they were encroaching on the defendant's gang territory. The connection here is missing and has not been articulated for the record.

Thus, the trial court held only that joinder was improper under Crim.R. 8(A), and not that evidence related to gang affiliation was so prejudicial as to be excluded under all circumstances.

{¶ 63} When, during the trial, the court actually considered the prejudicial impact of gang references, it arrived at the conclusion that some evidence of gang affiliation was suitable to explain motive and the relationships of the defendants with other individuals. Specifically, the court ruled:

So the State of Ohio will be permitted to make limited reference to the SG organization as that information relates to relationships between various

24

characters involved in events involved in the instant matter and to show

what it believes to be a motive for committing the crimes alleged in the

indictment or a common scheme or plan. The state may utilize whatever

evidence it deems appropriate to do so, but subject to review via objections

by defendants during the course of trial. The state will not be permitted to

introduce evidence to a jury regarding prior convictions of either defendant

unless either defendant chooses to testify or other alleged members of the

SG the Family gang or the SG organization. Certainly that does not include

[Juvenile B.M.] as he is currently testifying. The state will also not be

permitted to introduce any expert testimony regarding the specifics of this

organization or any other evidence specifically designated for purposes of

proving the participating in a criminal gang.

Thus, as required by the trial court's ruling, references to gang membership were limited

at trial to proof of the relationships between appellant, King, Juvenile B.M., Johnson, and

Hughes.

{¶ 64} The Supreme Court of Ohio, in *State v. Williams*, 134 Ohio St.3d 521, 983

N.E.2d 1278, 2012-Ohio-5695, has provided a three-step analysis for determining

whether other acts evidence is admissible. *Id.* at ¶ 19. "The first step is to consider

whether the other acts evidence is relevant to making any fact that is of consequence to

the determination of the action more or less probable than it would be without the

evidence." *Id.* at ¶ 20, citing Evid. R. 401. The second step is to "consider whether

25

evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether [it] is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

{¶ 65} As to the first step of the *Williams* test, Ohio courts have held that evidence of gang affiliation can be relevant and is admissible in cases in which the interrelationship between people is a central issue. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 170; *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 112. In this case, references to gang membership, which were limited to proof of the relationships between appellant, King, Juvenile B.M., Johnson, and Hughes, were relevant to show connectivity among the individuals who were involved in this case and, further, provided context regarding appellant's role in committing the offenses charged. *See State v. Peterson*, 10th Dist. Franklin No. 07AP-303, 2008-Ohio2838, ¶ 38 (Evidence of gang affiliation was relevant to show relationship between appellant and others and to "put the crimes in context.").

{¶ 66} Evidence of gang membership may also demonstrate a common purpose where, as here, individuals are charged with complicity in the commission of crimes. *Peterson* at ¶ 38.

{¶ 67} Finally, Ohio courts admit other acts evidence when relevant to proof of identity, including where establishing a connection between a firearm and a defendant.

*See State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d. 506, ¶ 24. Here, references to gang membership were relevant to show a connection between appellant and certain physical evidence that was recovered in this case, including the firearm that was recovered from beneath Hughes' seat and the shell casing that was recovered from the scene of the shooting.

{¶ 68} The second step of the *Williams* test relates to whether the evidence was presented to prove appellant's character and to show that the conduct was in conformity with that character. In this case, the trial court's strict limitations regarding the admissibility of gang-related evidence ensured that such evidence was presented for the narrow and proper purposes of demonstrating identity and the interrelationships among the individuals involved in this case, and not for the improper purpose of proving appellant's character.

{¶ 69} The third step of the *Williams* test requires us to consider whether the probative value of the gang evidence is substantially outweighed by the danger of unfair prejudice. We find, in this case, that it is not. Here, the prosecution did not seek to introduce evidence of prior convictions or criminal acts of the defendants or fellow members of SG the Family. Rather, the gang evidence in this case merely established the associations between appellant, King, Juvenile B.M., Johnson, and Hughes, which explained their relationships, provided context for the crimes at issue, and offered the means by which the defendants in the present case had access to a firearm later found in the car occupied by Johnson and Hughes.

27

{¶ 70} Appellant complains that co-counsel was permitted to introduce a photo of King's torso, depicting multiple tattoos, "allow[ing] the jury to infer that a gang affiliation links Appellant * * * with a propensity to commit [violent crimes]." Appellant does not, however, identify which, if any, of the tattoos were associated with gang membership. In addition, there was no testimony explaining the significance of the tattoos or actually linking the tattoos to gang membership. Absent any testimony that the tattoos have a particular gang-related significance, we find that the photo should not be presumed to be prejudicial.

{¶ 71} Lastly, we recognize that the trial court expressly instructed the jury regarding the limited purpose of the gang-related evidence, stating:

> Evidence was received about the defendants' association with a gang. That
>
> evidence was received only for the limited purpose of proving identity and
>
> the interrelationship between defendants and/or accomplices and should not
>
> be considered for any other purpose.

Such an instruction reduces the danger of undue prejudice caused by the admission of evidence. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 70. As the trial court did not abuse its discretion in admitting evidence of gang membership, the second assignment of merit is found not well-taken.

{¶ 72} Appellant argues in his third assignment of error that the trial court erred in denying his Crim.R. 29 motion for acquittal on all of the charges. In reviewing a denial of a Crim.R. 29 motion for acquittal we use a sufficiency standard. *State v. Crenshaw*,

28

8th Dist. Cuyahoga No. 108830, 2020-Ohio-4922, ¶ 16. The test for sufficiency of the evidence requires an appellate court to determine whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. This determination focuses on the question of whether the evidence admitted at trial, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 73} R.C. 2923.03(A), defines the offense of complicity as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

R.C. 2903.02(B), which defines the offense of felony murder, states in relevant part:

29

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

{¶ 74} Here, the predicate offense for the felony murder charge was aggravated robbery, in violation of R.C. 2911.01(A)(1) and (C). R.C. 2911.01(A)(1) and (C) provide:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

{¶ 75} Appellant was also convicted for felonious assault, in violation of R.C. 2903.11(A)(2) and (D). As set forth in those provisions:

(A) No person shall knowingly * * *

* * *

(2) Cause or attempt to cause physical harm to another or to another's

unborn by means of a deadly weapon or dangerous ordnance.

(D)(1)(a)Whoever violates this section is guilty of felonious assault.

Except as otherwise provided in this division or division (D)(1)(b) of this

section, felonious assault is a felony of the second degree.

*Id.*

{¶ 76} We begin with appellant's conviction for complicity in the commission of murder. "Under Ohio law, a defendant can be held criminally responsible for a killing 'regardless of the identity of * * *the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the underlying offense.'" *State v. Rudasill*, 10th Dist. Franklin No. 19AP-61, 2021-Ohio-45, ¶ 77, quoting *State v. Dixon,* 2d Dist. No. 18582, 2002 WL 191582 (Feb.8, 2002). Death is the "proximate result" of a defendant's conduct when it is "a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience." *Dixon* at *5.

{¶ 77} "Foreseeability should be assessed from the viewpoint of what the defendant knew or should have known in light of ordinary experience." *State v. Long*, 2021-Ohio-2656, 175 N.E.3d 1021, ¶ 33 (10th Dist.). "[W]hen a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and reasonably inevitable

consequences of death resulting from his original criminal act." *Id.* It is not necessary that an accused be in a position to foresee the precise consequence of his conduct, "only that the consequences be foreseeable in the sense that what transpired was natural and logical in that it was within the scope of the risk created by [the accused's] conduct." *State v. Hubard*, 8th Dist. Cuyahoga No. 83389, 2004-Ohio-5204, ¶ 40.

{¶ 78} The only mental state required for conviction under R.C. 2903.02(B) is the mental state required for the underlying felony offense. *See e.g., State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, syllabus (holding that a conviction for felony murder with felonious assault as the underlying offense is supported by evidence that the defendant knowingly caused physical harm to the victim). "The felony-murder statute imposes what is in essence strict liability[;] [t]hough intent to commit the predicate felony is required, intent to kill is not." *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, ¶ 9. The felony-murder statute is intended "to characterize a homicide, though unintended and not in the common design of the felons, as an intentional killing." *Id.*

{¶ 79} Because the predicate offense for the felony murder charge was aggravated robbery in violation of R.C. 2911.01(A)(1) and (C), the only applicable mental state was "knowingly," for theft. *See State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 55. The deadly-weapon element of aggravated robbery does not require a mens rea. *State v. Lester*, 123 Ohio St.3d 396, 2009-Ohio-4225, 916 N.E.2d 1038.

32

{¶ 80} Felonious assault in violation of R.C. 2903.11(A)(2) requires proof that appellant knowingly caused or attempted to cause physical harm by means of a deadly weapon. *See id.*

{¶ 81} The prosecution's theory of complicity required evidence that appellant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *See State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus (holding that to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.) Intent may be inferred from an individual's presence, companionship and conduct before and after the offense is committed. *Id.* at 245. The state is not required to establish the principal offender's identity in seeking a conviction for complicity. *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976), paragraph four of the syllabus, vacated on other grounds, 438 U.S. 911, 98 S.Ct.3136, 57 L.Ed.2d 1156 (1978); *see also State v. Washington*, 8th Dist. Cuyahoga No. 79300, 2002-Ohio-505 (when witnesses either identified another defendant as a shooter or could not identify the shooter, an aider and abettor could still be convicted of crimes related to the shooting). And leadership in a criminal plan is not a required element of the offense; rather, evidence that the defendant provided support, assurances, and cooperation or advice to a principal in the commission

33

of a crime with shared criminal intent is sufficient. *See State v. Terrell*, 1st Dist. Hamilton No. C-020194, 2003-Ohio-3044, ¶ 10.

{¶ 82} Ohio law recognizes that death and injuries are reasonably foreseeable consequences of firing shots into an occupied vehicle. *See State v. Tuggle,* 6th Dist. Lucas No. L-09-1317, 2010-Ohio-4162, ¶ 110-111. And firearm specifications are appropriate even where a defendant only aided and abetted a shooter, where a finding of assistance and cooperation with those using a firearm is supported by testimony regarding planning and execution of the crime in question. *See e.g., State v. Gist*, 2d Dist. Montgomery No. 21436, 2007-Ohio-5571, ¶ 12-13.

{¶ 83} Appellant does not dispute that there was sufficient evidence that he acted with the mens rea necessary for a theft offense. That mens rea was sufficient to support a theory of criminal liability for all actions taken by appellant's complicitors during the commission of the armed robbery.

{¶ 84} Here, there was testimony that before the shooting, appellant planned the armed robbery of Seller, contacted Seller in order to set up the robbery, and provided his accomplices with a phone and a firearm to facilitate the robbery.

{¶ 85} Juvenile B.M. and King stood by at the address where appellant told Seller to come and wait until Seller phoned. Once Seller phoned, Juvenile B.M. and King went to the car, armed with their handguns, and confronted the car's three occupants. The driver attempted to flee, but shots were fired.

34

{¶ 86} The gunshots indisputably injured two of the car's occupants, and caused the death of one of them. Seller testified that he ducked down when he saw the laser beam of one of the guns across his eyes, and there was testimony that the trajectory of a bullet in the car would have struck someone seated in a normal position in the seat behind the driver. The jury could reasonably infer that the shots were fired in an attempt to cause physical harm to Seller. As indicated above, death is a reasonably foreseeable consequence of firing one or more guns into a car occupied by three individuals. *See Tuggle* at ¶ 110-111.

{¶ 87} After the shooting, appellant was waiting in a car to which the other two men ran, and then appellant gave Juvenile B.M. a ride home. Appellant provided assistance, cooperation, encouragement, and advice, both before and after the shooting, while sharing the criminal intent to rob Seller.

{¶ 88} The evidence, taken in a light most favorable to the state, was clearly sufficient to support appellant's conviction for complicity in the commission of aggravated robbery, which is a first degree felony. Because the murder was foreseeable and occurred during the commission of that felony, there was also sufficient evidence to support the conviction for complicity in the commission of felony murder. The evidence was also sufficient to support the three convictions for felonious assault and the firearms specifications that were attendant to each of the offenses charged. Accordingly, appellant's third assignment of error is found not well-taken.

{¶ 89} Finally, appellant argues in his fourth assignment of error that the verdicts in this case were against the manifest weight of the evidence due to inconsistencies in Juvenile B.M.'s testimony and credibility issues arising from Juvenile B.M.'s cooperation with law enforcement and resulting favorable plea agreement.

{¶ 90} In considering a manifest weight challenge, the court reviews "the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of all witnesses" to determine "'"whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed."'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 328, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). (Additional quotation omitted.)

{¶ 91} Ohio law is clear that discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the appellant and against conviction. *State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995. A defendant is not entitled to a reversal on manifest weight grounds simply because inconsistent evidence was presented at trial. *State v. Gunn,* 6th Dist. Lucas No. L-20-1034, 2021-Ohio-2253, ¶ 41, citing *State v. Lowery*, 6th Dist. Lucas No. L-18-1170, 2020-Ohio-5549, ¶ 80, *appeal not allowed*, 162 Ohio St.3d 1421, 2021-Ohio-1201, 166 N.E.3d 13. (Additional citation omitted.) Weight and credibility determinations are appropriately left to the trier of fact, who "'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor and determine whether

the witnesses' testimony is credible.'" *Id.* Therefore, we afford "'defer[ence] to the trial court's credibility determination and conclusion.'" *State v. Higgens*, 1st Dist. Hamilton No. C-220043, 2022-Ohio-2754, ¶ 13, quoting *Kinnett v. Corporate Document Solutions, Inc.*, 1st Dist. Hamilton No. C-180189, 2019-Ohio-2025, ¶ 21.

{¶ 92} Appellant's manifest weight challenge focuses on the perceived advantage incurred by Juvenile B.M. through his cooperation with law enforcement, as well as on several inconsistencies between Juvenile B.M.'s testimony and other evidence, including Juvenile B.M.'s statement that he had a 9mm firearm provided to him by appellant but never fired it. But the jury heard details regarding Juvenile B.M.'s agreement to testify and the state's decision not to pursue an adult prosecution. And Juvenile B.M. was subjected to rigorous cross-examination exploring the alleged inconsistencies in his testimony. The jury was in the best position to weigh his demeanor and those inconsistencies and to determine whether his testimony was credible. The fact that the jury rejected appellant's arguments does not render the verdicts against the manifest weight of the evidence. Appellant's fourth assignment of error is found not well-taken.

{¶ 93} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part, consistent with this opinion. We remand the case to the trial court so that a minimum and maximum term can be imposed for the second count of felonious assault in accordance with R.C. 2929.14(A)(2) and so that an aggregate sentencing range can be determined and imposed by the trial court in

37

accordance with R.C. 2929.144.  The costs of this appeal are ordered to be divided

between appellant and appellee, pursuant to App.R. 24.

Judgment affirmed in part,<br>
reversed in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.           _____
                                                            JUDGE

Thomas J. Osowik, J.           
                                          _____

Myron C. Duhart, P.J.                                             JUDGE
CONCUR.

                                                            _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.