[Cite as *State v. Peabody*, 2024-Ohio-185.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                    Court of Appeals No.  E-22-042

    Appellee                             Trial Court No.  2017CR0487

v.

William J. Peabody                        **DECISION AND JUDGMENT**

    Appellant                            Decided:  January 19, 2024

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

Brian A. Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Defendant-appellant, William J. Peabody, appeals the September 6, 2022 judgment of the Erie County Court of Common Pleas, convicting him of several drug possession and trafficking offenses and sentencing him to an aggregate prison term of 95 months.  For the following reasons, we affirm, in part, and reverse, in part.

# I.    Background

{¶ 2} William Peabody was charged with drug possession and trafficking offenses arising out of two incidents.  The first incident occurred on January 27, 2017.  Peabody was charged with possession of cocaine, a violation of R.C. 2925.11(A) and (C)(4)(a), a fifth-degree felony (Count 1); and two counts of aggravated possession of drugs, violations of R.C. 2925.11(A) and (C)(1)(a), fifth-degree felonies (Counts 2 and 3).  The second incident occurred on February 27, 2017.  Peabody was charged with possession of cocaine, a violation of R.C. 2925.11(A) and (C)(4)(a), a fifth-degree felony (Count 4); complicity in the commission of possession of heroin, a violation of R.C. 2923.03(A) and (F), a second-degree felony (Count 5); complicity in the commission of trafficking of heroin, a violation of R.C. 2923.03(A)(2) and (F), a second-degree felony (Count 6); complicity in the commission of possession of cocaine, a violation of R.C. 2923.03(A)(2) and (F), a fifth-degree felony (Count 7); and complicity in the commission of trafficking of cocaine, a violation of R.C. 2923.03(A)(2) and (F), a fifth-degree felony (Count 8).

{¶ 3} The matter proceeded to a jury trial beginning on June 27, 2022.  The state presented testimony from Sergeant Troy Dillinger, Detective Ron Brotherton, and Lieutenant Danny Lewis of the Sandusky Police Department; Deputy Chad Henderson of the Erie County Sheriff's Department; Detective Joseph Rotuno of the Perkins Township Police Department; Sara Tipton, Samuel Fortener, and Kelsey Degen, forensic scientists

2.

with the Ohio Bureau of Criminal Investigations; and Kyohn Green-Burton and Misty Schultz, two of Peabody's co-defendants.

## A. The January 27, 2017 Incident

{¶ 4} According to the evidence presented at trial, on January 27, 2017, Sergeant Dillinger was patrolling the area near the Value Inn in Sandusky, a location known to law enforcement for illegal drug transactions and use. He was dressed in uniform and driving a marked police cruiser. A vehicle caught his attention; the driver rolled down the window as if he was going to say something to Sergeant Dillinger, but he didn't.

{¶ 5} Sergeant Dillinger drove a little further down the street, but continued to monitor the Value Inn at a distance. The vehicle he had noticed before pulled out. Sergeant Dillinger observed that the vehicle had an excessively loud exhaust, so he initiated a traffic stop. He made contact with the driver, who identified himself as William Peabody. He was alone in the vehicle.

{¶ 6} Peabody told Sergeant Dillinger that he was aware that his exhaust was loud, and he also told him that his driver's license was expired. He said that he had had two passengers in his vehicle, but they exited his vehicle quickly because they had recently been released from prison and may have had outstanding warrants. Sergeant Dillinger recognized the name of one of the men and knew him to use illegal drugs. Sergeant Dillinger also knew that Peabody was associated with drugs.

3.

{¶ 7} Sergeant Dillinger asked Peabody for consent to search the vehicle, which belonged to Peabody's father. He declined, insisting that there was nothing illegal in the vehicle. Sergeant Dillinger called for the K-9 unit to do a free air sniff. The dog alerted to the odor of narcotics.

{¶ 8} Sergeant Dillinger instructed Peabody to exit the vehicle. As he did, a syringe fell off his lap. Peabody agreed to allow Sergeant Dillinger to search his person; no contraband was found during that search. A search of his vehicle did, however, lead to the recovery of drug-related items, including: (1) a metal spoon with white, filmy residue on it, retrieved from the center console; (2) two metal spoons with residue and burns, retrieved from the back seat; (3) a crack pipe stuffed with wire mesh, retrieved from the back seat; and (4) a metal tube with residue and a crack pipe with residue stashed in the ventilation system. Sergeant Dillinger conceded that the crack pipes were located in the vent such that they would not be visible from the driver's seat. They could not be removed immediately because the officers did not have the tools to remove them there; they were removed after the vehicle was towed. Lieutenant Danny Lewis removed the items using a coat hanger. Syringes and prescriptions belonging to Peabody's father, a diabetic, were also found in the vehicle, but were not confiscated. The spoon from the console and one of the spoons from the backseat were from a matching set.

{¶ 9} Sergeant Dillinger decided not to arrest Peabody, but rather to test the items first. The items were brought to the station, tagged and bagged, and secured for testing

4.

by BCI. Sergeant Dillinger acknowledged that he did not see anything illegal just by looking into the car. He did not attempt to gather fingerprints from any of the items and did not administer blood, urine, or field sobriety tests.

{¶ 10} Peabody's father retrieved the car. He said the syringes were in the car because he was diabetic. Peabody's father is now deceased.

{¶ 11} Another officer, Sergeant Lillo, told Sergeant Dillinger that he saw two passengers in the vehicle earlier. Sergeant Dillinger did not know if those passengers were both in the backseat. The passengers quickly distanced themselves from the vehicle when they saw Sergeant Lillo drive through the parking lot.

{¶ 12} Testing later revealed that the spoon found in the center console had trace amounts of cocaine, fentanyl, and 3-methylfentanyl. A metal tube had trace amounts of cocaine. Testing of those items was performed by Sara Tipton, a forensic scientist in the drug chemistry section of the BCI. The two metal spoons from the backseat, one of the metal tubes, and the glass tube were not tested. Sergeant Dillinger explained that it is his practice to charge the person who is in immediate possession of the contraband.

## B. The February 27, 2017 Incident

{¶ 13} The Sandusky Police Department received information from a female informant that Peabody was in possession of $10,000 worth of illegal drugs that he and another man transported from Lansing, Michigan. The informant ("CI") stated that Peabody was staying at a hotel and that she could buy heroin from him. Detective Ron

5.

Brotherton contacted the Perkins County Police Department. Together, Detective Brotherton, Lieutenant Danny Lewis, Detective Joseph Rotuno, and Detective Roesch, also of the Perkins Township Police Department, established a joint investigation. Lieutenant Lewis was the lead investigator.

### 1. Testimony from Law Enforcement and BCI

{¶ 14} On February 27, 2017, law enforcement arranged for the CI to make a controlled buy of narcotics from Peabody using marked bills. Detective Brotherton and Lieutenant Lewis set up surveillance at Walmart, next to the hotel where they believed Peabody was staying. Detectives Rotuno and Roesch set up surveillance at the hotel. The officers searched the CI and her vehicle to ensure that she was not carrying other drugs or money. She was given $310 in marked money, which police had photocopied before giving to her. Officers wrote down the phone number she used to call Peabody.

{¶ 15} The CI picked up Peabody outside Walmart. They had a short conversation, then Peabody gave her 1.6 grams of what was determined by BCI to be heroin and fentanyl in exchange for $310. She dropped him off at the hotel. Afterwards, the CI gave the drugs to the officers and they again searched her and her vehicle. Although the officers did not see the hand-to-hand exchange of drugs for money, the CI gave them a report of what happened during the transaction.

{¶ 16} Peabody was followed after completing the transaction. He went to the second floor of the Super 8 hotel, room 213. An hour later, Peabody and Misty Schultz

left the hotel in a rental car and headed to a gas station near the hotel. Detective Brotherton had a warrant to serve on Peabody, so he and Detective Roesch followed him. Lieutenant Lewis and Detective Rotuno stayed at the hotel and continued to surveil the room.

{¶ 17} Detectives Brotherton and Roesch arrested Peabody at the gas station. Peabody was in the driver's seat and Schultz was seated in the front seat of the vehicle. The officers searched Peabody and found that he was carrying a bindle of drugs, drug paraphernalia, and $10 of the marked money. Miniature balloons were also found in the vehicle. It was common in 2017 for traffickers to transport illegal narcotics in balloons.

{¶ 18} Schultz revealed that she had rented the hotel room, which gave her control over the room. Schultz agreed to cooperate with officers. She was escorted back to the hotel, where she consented to a search of the room. They retrieved a key from the front desk. Schultz denied that anyone else was in the room, but when Detective Rotuno and Lieutenant Lewis opened the door, they saw two people. Schultz was ordered to the ground.

{¶ 19} The two occupants of the room were identified as Kyohn Green-Burton and Natasia Coles-Phillippi. Detective Rotuno immediately saw a large bag of what appeared to be crack cocaine on the nightstand between the two beds. He saw syringes and bindles of packaged drugs next to the bag of crack cocaine. They recovered a large bag of heroin and fentanyl from the room. There was $715 in cash found in the room, $300 of which

7.

was the marked money that the CI used to make the purchase from Peabody. The officers recovered additional items from the room, including cellophane with crack cocaine in it; a digital scale like those commonly used in drug trafficking to weigh product to be sold on the streets; two paper bindles made from pages of a phone book, similar to the bindle Peabody was carrying; a large bag of syringes, commonly used to inject illegal drugs; a bottle of gabapentin with the label scratched off; alcohol wipes; a piece of paper wrapped with chore boy; a crack cocaine pipe; marijuana; a Crown Royal bag; Q-tips wrapped around a visa card; and a packet of kool-aid. (There was some suggestion that Coles-Phillippi had mixed kool-aid with heroin before cooking and injecting it.) A number of cell phones were confiscated, but none were examined because it was deemed unnecessary.

{¶ 20} Some of the confiscated items were sent to BCI for analysis. Because BCI has limits on the number of items per incident that it will test, the investigators assigned certain items to Peabody, and other items to Schultz, Green-Burton, and Coles-Phillippi, so that BCI would test as many items as possible. All of these individuals were charged with possession of the drugs because they were all involved and associated with the items found. It was believed that Green-Burton had supplied the drugs and Peabody was selling them. Schultz was complicit because she was in the room and rented it in her name, and Phillippi was believed to have been there "for the ride and for the dope."

8.

{¶ 21} Samuel Fortener, a forensic scientist with BCI, tested the contents of a plastic bag, which contained an unknown tan substance.  This was the bag that Peabody gave to the CI.  Fortener determined that the bag contained approximately 1.69 grams of heroin and fentanyl.  Kelsey Degen, a forensic scientist with BCI, tested several plastic bags containing an unknown off-white substance.  One contained approximately 4.96 grams of cocaine (submitted under Schultz's name); one contained approximately .18 grams of a combination of cocaine, heroin, and fentanyl (submitted under Schultz's name); one contained approximately .31 grams of cocaine (submitted under Peabody's name); and one contained approximately 19.13 grams of heroin and fentanyl (submitted under Green-Burton's name).  Degen also tested a metal spoon with residue retrieved from the hotel room (submitted under Coles-Phillippi's name), which she determined contained trace amounts of cocaine, heroin, and fentanyl.

{¶ 22} Pertinent to Peabody's assignments of error on appeal, Deputy Chad Henderson of the Erie County Sherriff's Department testified that Judge McGookey signed a bench warrant for Peabody's arrest, file stamped June 14, 2019.  Peabody was eventually found two years later in Yuma, Arizona, where he was incarcerated for a new drug offense.  Deputy Henderson executed the warrant on June 25, 2021.

### 2. Testimony of Co-Defendants

{¶ 23} The state secured the cooperation of two of Peabody's co-defendants, Green-Burton and Schultz.  Both testified at trial.

9.

### a. Kyohn Green-Burton

{¶ 24} Green-Burton testified that he is from Detroit. He and Peabody met in Lansing, Michigan toward the end of February of 2017, and agreed that Green-Burton would obtain drugs, including crack cocaine and heroin, for Peabody to sell in Ohio. They would split the profits, but not necessarily evenly. Green-Burton had not been to Erie County before this time.

{¶ 25} Peabody's father rented a car, and he, Peabody, and Green-Burton drove from Lansing to Erie County. As agreed, Green-Burton obtained the drugs; Peabody carried them because Green-Burton did not like to travel with drugs on him. Although he did not remember the exact quantities, he estimated that he had 28 grams of crack cocaine and 20 grams of heroin.

{¶ 26} When they got to Erie County, they dropped Peabody's father off and picked up Schultz, who Green-Burton had not met before. The plan was for Green-Burton to stay at the house of a woman Peabody knew. They gave her drugs as an incentive, but the woman would not let him in. Schultz agreed to rent a hotel room for him in her name. Green-Burton's friend from West Virginia, Coles-Phillippi, met them there. Green-Burton and Coles-Phillippi slept in the hotel room; Peabody and Schultz did not. Both Green-Burton and Coles-Phillippi had been involved in the sale of narcotics; he began selling some time in 2016.

10.

{¶ 27} Green-Burton and Peabody decided that Peabody would work on establishing a phone line of people to buy the drugs since Green-Burton did not know anyone in Erie County. Peabody made calls from his own phone, but he did not make or take calls from the room. Green-Burton would give the drugs to Peabody, Peabody would leave, then he would return and say they had been sold. Peabody left four or more times. They got arrested three or four days after they arrived.

{¶ 28} At the time of the arrest, Green-Burton was found in possession of 19 grams of heroin and five grams of cocaine, which was less than the amount he had when he arrived. The remainder had been used or sold. Green-Burton used only marijuana— not heroin or crack cocaine. He does not believe that Schultz used any heroin. The drugs were stored in a Crown Royal bag. He did not remember how much money was confiscated from the room.

{¶ 29} Green-Burton was charged as a co-defendant. He entered a plea of guilty to the charges arising from the February 2017 arrest. He was sentenced to 41 months in prison, to run concurrently with a one-year sentence he's required to serve in Michigan. After he was sentenced, he was approached by the state to discuss his willingness to testify at trial. The state agreed that in exchange for his testimony, it would not oppose Green-Burton serving six months in a locked treatment facility in Ohio after he served his sentence in Michigan. The court will ultimately decide whether to grant him judicial release and allow him to serve the reduced time in a treatment facility, and it will

11.

consider his prison performance record in making that decision. Green-Burton explained that he would be in danger in the prison yard for having testified against Peabody.

{¶ 30} Green-Burton has not spoken to Schultz since the arrest. He confirmed that the plan to sell drugs in Ohio occurred between he and Peabody, not with Schultz or Coles-Phillippi.

{¶ 31} Pertinent to Peabody's assignments of error, Green-Burton testified concerning his criminal history. He claimed that he had been convicted of a first-degree home invasion in Michigan for removing his brother's bike from someone's garage. He was also charged in West Virginia with possession of crack cocaine and heroin. He insisted that he has no other felony convictions on his record.

### b. Misty Schultz

{¶ 32} Schultz testified that she and Peabody went to school together and were in a romantic relationship. She described herself as an alcoholic and closet drug user. She said that weed was her drug of choice, but at the time of the arrest, she was also using crack cocaine. She estimated that she had used heroin three times.

{¶ 33} Peabody sent Schultz a picture from Michigan of a large amount of crack cocaine that he found. Schultz told him to give it back and not to "mess with the dope boys." He told her he was coming back to sell drugs that he obtained from Green-Burton.

12.

{¶ 34} Peabody and Green-Burton traveled to Schultz's home from Michigan on February 25, 2017. It was the first time she met Green-Burton. She bought $30 worth of crack, which she and Peabody smoked in her driveway.

{¶ 35} The original plan was that Green-Burton and Coles-Phillippi would stay at the home of L.G. and use it as a trap house from which drugs would be sold. L.G. had known drug contacts and people often consumed drugs at her home. But L.G. wanted too much money to rent them her place, so they decided to get a room at the Super 8 hotel. Schultz has a license, so she rented the room with her identification. Green-Burton gave her cash to pay for the room. They were assigned room 213.

{¶ 36} Schultz explained that she had gone to the hotel for sex, drugs, and partying. She watched TV, smoked, and did drugs with Peabody and Coles-Phillippi. Schultz testified that she and Coles-Phillippi smoked crack while at the hotel, not heroin. Green-Burton did not use the drugs.

{¶ 37} Peabody sold crack cocaine and heroin out of the hotel room. He was making calls and getting texts back and forth trying to move product. The drugs were packaged in sandwich baggies that either Peabody or Green-Burton assembled. Schultz did not know the quantities that had been brought there from Michigan. She admitted that she owns a scale, but denied that the scale found in the hotel room belonged to her. Schultz estimated that Peabody arranged 30 drug transactions within a three-day period. He was constantly on his cell phone.

13.

**{¶ 38}** Peabody went out to sell drugs in the Walmart parking lot. Schultz remained in the hotel room when he left for Walmart. He returned, and about an hour or so later, she and Peabody left to go get gas in a car that Peabody's father had rented. While at the gas station, she and Peabody got arrested. She was not aware of anything illegal in the car and she had no drugs on her other than some char that had fallen into her purse. Schultz explained that she had smoked any crack she had had.

**{¶ 39}** When the car was searched, police found a dirty spoon in the glove compartment. Schultz was seated in the passenger seat. Detective Brotherton told her that she could be charged for possession of the spoon if nobody admitted it was theirs. Schultz asked Peabody to "take his charge" because the spoon was his, but he turned his back to her. Because Peabody refused to admit the spoon was his, Schultz decided to consent to a search of the hotel room. Schultz believes she confirmed for police that there were others in the hotel room. She was ordered to lie face down on the floor outside the room while law enforcement raided it. Green-Burton and Coles-Phillippi were arrested. Schultz testified that the arrests occurred on February 27, 2017, Peabody's birthday.

**{¶ 40}** Schultz was charged with two second-degree felonies. As part of a plea agreement, she entered a plea to complicity to possess cocaine, a fifth-degree felony, and was granted probation. She violated probation and served 182 days in jail. As part of her agreement with the state, she was expected to testify against Peabody, Green-Burton, and

14.

Coles-Phillippi. She has not talked to Green-Burton since the arrest; she has talked to Coles-Phillippi once since then.

**C. The Verdict**

{¶ 41} The jury found Peabody guilty of all counts. The trial court determined that Counts 2 and 3, 5 and 6, and 7 and 8 merged for purposes of sentencing. It sentenced Peabody to a prison term of 11 months on Count 1; 11 months on Count 2; 11 months on Count 4; seven years on Count 6; and 11 months on Count 7. It ordered that Counts 1, 2, and 7 be served concurrently with each other and consecutively with Count 6, for a total prison term of 95 months. Peabody appealed. He assigns the following errors for our review:

I. Appellant's convictions were against the manifest weight of the evidence.

II. The trial court erred in denying Appellant's Motion to Dismiss on speedy trial grounds, in violation of Appellant's right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III. The failure of Appellant's trial counsel to cross-examine the State's witness, Kyohn Green-Burton, as to his prior criminal history constituted ineffective assistance of counsel, in violation of Appellant's

15.

right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

IV. The trial court's decision to give a jury instruction on consciousness of guilt was an abuse of discretion.

V. The trial court's imposition of consecutive sentences on Appellant was contrary to law for failing to make the requisite findings, under R.C. 2929.14(C)(4), at both Appellant's sentencing hearing and in its sentencing entry.

## II. Law and Analysis

{¶ 42} In his first assignment of error, Peabody argues that his convictions are against the manifest weight of the evidence. In his second assignment of error, he argues that his right to a speedy trial was violated. In his third assignment of error, he argues that counsel was ineffective for failing to cross-examine Green-Burton about his criminal history. In his fourth assignment of error, he argues that the trial court erred when it instructed the jury on consciousness of guilt. And in his fifth assignment of error, he argues that the trial court failed to make the requisite findings before imposing consecutive sentences.

{¶ 43} We consider each of Peabody's assignments in turn.

16.

## A. Manifest Weight

{¶ 44} In his first assignment of error, Peabody argues that his convictions are against the manifest weight of the evidence. First, he maintains that he was not in the hotel room when officers entered, therefore, he could not have possessed the items found in the room. Second, he insists that testimony from Green-Burton and Schultz that he "constructively" possessed the items in the room should have been disregarded because those witnesses testified in exchange for deals with the state. Third, he complains that the state did not take fingerprints from the digital scale found in the room, did not investigate phones seized from the room, and did not examine GPS data as part of its investigation, and he emphasizes that spoons containing drug residue were not located on his person. Finally, he argues that the state failed to prove that he "knowingly" possessed items found in the vehicle he was driving on January 27, 2017, because it was his father's vehicle, and the items were found in compartments that could not easily be accessed.

{¶ 45} The state responds that Peabody's convictions were premised on theories of constructive possession and complicity. It argues that its plea agreements with Green-Burton and Schultz were disclosed to the jury, and it was up to the jury to make credibility determinations. The state maintains that fingerprint evidence, GPS data, and cell phone extractions were not necessary and would have merely bolstered the testimony of Peabody's co-defendants. And it insists that the jury did not lose its way in determining that Peabody knowingly possessed the items found in his father's car

17.

because he was in control of the vehicle when the items were found and he constructively possessed the items that were not found on his person.

{¶ 46} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 47} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

18.

{¶ 48} Peabody first argues that because he was not present in the hotel room when the officers entered the room, he could not have possessed the items found there. Under R.C. 2925.11(A), "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Possession may be actual or constructive. *State v. Williams,* 6th Dist. Lucas No. L-14-1056, 2016-Ohio-439, ¶ 16. Under R.C. 2923.03(A)(2), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." A jury could find Peabody guilty if it concluded that Peabody actively or constructively possessed the drugs or if he aided or abetted in the possession of the drugs. Importantly, Peabody was convicted of complicity in the commission of possession of heroin and cocaine.

{¶ 49} With respect to the drugs in the hotel room, the state's theory was that Peabody constructively possessed the drugs or aided or abetted his co-defendants in possessing the drugs. "'Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his [or her] immediate physical possession.'" *State v. Weemes,* 6th Dist. Lucas No. L-18-1243, 2020-Ohio-140, ¶ 44, quoting *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). Proof of constructive possession requires "evidence demonstrating that the defendant was conscious of the presence of the object." *Weemes* at ¶ 44.

19.

{¶ 50} A person has aided or abetted an offense "if he has supported, assisted, encouraged, cooperated with, advised, or incited another person to commit the offense." *State v. Scott,* 5th Dist. Morgan No. 2006-CA-002, 2006-Ohio-6390, ¶ 39, citing *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." (Internal quotations and citations omitted.) *State v. McFarland,* 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 29.

{¶ 51} Here, the state presented evidence that Peabody and Green-Burton devised a plan to transport drugs from Lansing to Erie County to sell to Peabody's contacts in Erie County. Peabody personally carried the drugs on the car ride because Green-Burton did not like to travel with drugs. Peabody took Green-Burton (and the drugs, which were in the car) to L.G.'s house in the hope that they could use L.G.'s house as a trap house, and gave L.G. drugs to entice her to allow them to use her home. Peabody introduced Green-Burton to Schultz, who ultimately rented the hotel room where they would store the drugs while Peabody shored up customers. Peabody was seen coming and going from the hotel room where the officers found the drugs. He carried drugs from the hotel to sell to the CI. He arranged and carried out numerous additional sales of those drugs. And when he we was arrested, he was carrying a bindle of drugs, packaged in paper torn from a phone book. All these facts evidence his knowledge that the drugs were stored in the room, that he exercised dominion or control over the drugs, and that he "supported,

20.

assisted, encouraged, cooperated with, advised, or incited" his co-defendants in the possession of the drugs. *See State v. Lane*, 2022-Ohio-3775, 202 N.E.3d 45, ¶ 66 (3d Dist.), *appeal not allowed,* 169 Ohio St.3d 1443, 2023-Ohio-554, 203 N.E.3d 737, *reconsideration denied,* 170 Ohio St.3d 1421, 2023-Ohio-1507, 208 N.E.3d 857 (detailing evidence of complicity to possess drugs, including evidence indicating that defendant had knowledge that father of her child was selling drugs out of her home and that she helped to further his actions by providing a location from which he could sell drugs, selling the drugs in his absence, and soliciting the help of her friends to further his actions).

{¶ 52} Peabody next argues that testimony from Green-Burton and Schultz that he "constructively" possessed the items in the room should have been disregarded because those witnesses testified in exchange for deals with the state. He insists that jurors should have viewed their testimony with grave suspicion, given the testimony reduced weight, and found the testimony not credible.

{¶ 53} The trial judge properly instructed the jury that accomplice testimony "should be viewed with grave suspicion and weighed with great caution." "A jury is presumed to follow the instructions given to it by the trial judge." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 52, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). We, therefore, presume that the jury, in fact, viewed Green-Burton and Schultz's testimony with grave suspicion and weighed it with

21.

great caution. Ultimately, however, it was the jury's role to make credibility determinations and to assign the weight to be given to these witnesses' testimony. It was informed of the agreements that Green-Burton and Schultz made with the state and those witnesses were cross-examined by defense counsel. The fact that the jury found Green-Burton and Schultz to be credible does not render Peabody's convictions against the manifest weight of the evidence. *See State v. Flow,* 2022-Ohio-4416, 203 N.E.3d 201, ¶ 92 (6th Dist.).

{¶ 54} Peabody next complains that the state did not take fingerprints from the digital scale found in the room and did not investigate phones seized from the room. He criticizes the state for failing to examine GPS data as part of its investigation and to use GPS data to corroborate Green-Burton's testimony that he and Peabody had driven a rental car from Lansing, Michigan to Erie County. Peabody insists that the state's failure to present this type of evidence should have weighed heavily against it.

{¶ 55} The state was not required to produce fingerprint evidence linking Peabody to the crimes. *See State v. Cook,* 12th Dist. Butler No. CA2022-02-016, 2023-Ohio-256, ¶ 31. Nor was it required to present evidence of the contents of the cell phones it seized or GPS data confirming his whereabouts. *See, e.g., State v. Terry*, 8th Dist. Cuyahoga No. 91290, 2009-Ohio-1878, ¶ 10 (concluding that convictions were not against the sufficiency or weight of the evidence despite cell phone evidence not having been

22.

offered). Peabody's challenges do not render his convictions against the manifest weight of the evidence.

{¶ 56} Finally, Peabody argues that the state failed to prove that he "knowingly" possessed items found in the vehicle he was driving because it was his father's vehicle, and the items were found in compartments that could not easily be accessed. The state counters that Peabody was the sole occupant and driver of the vehicle, thus he was exercising dominion and control over the items found in the vehicle regardless of the fact that it belonged to his father.

{¶ 57} First, the state was not required to show that Peabody owned the vehicle. Because he was driving the vehicle and was able to exercise dominion and control over the vehicle and its contents, he could be charged with possession for illegal items found in the vehicle. *See, e.g., State v. Graziani*, 3d Dist. Defiance No. 4-10-01, 2010-Ohio-3550, ¶ 17 (recognizing that ownership of vehicle was not necessary to show that defendant had possession, use, and control of the vehicle and constructive possession of the drug paraphernalia found in the vehicle); *State v. Reed*, 6th Dist. Erie No. E-17-038, 2018-Ohio-4451, ¶ 18. As for the spoon with residue found in the console of the vehicle, this court has held that a driver may be convicted for possession of drugs or paraphernalia found in a center console, regardless of the fact that he or she did not own the vehicle. *See Reed* at ¶ 9-20. Finally, as to the items found in the air vent, the court in *State v. Paige*, 8th Dist. Cuyahoga No. 97939, 2012-Ohio-5727, ¶ 16-18, affirmed the

23.

defendant's conviction for possession of drugs found in the air vent of a vehicle even though the vehicle belonged to his uncle and his uncle allegedly allowed others to drive the vehicle. While there was evidence in this case that officers had to use a wire hanger to remove the items from the air vent, the jury could reasonably have concluded that the items belonged to Peabody and not his father.

{¶ 58} In short, it was the role of the jury to judge credibility and weigh the evidence here. We cannot say that the jury lost its way in resolving the facts in favor of the state. This is not the exceptional case in which the evidence weighs heavily against the conviction. We find Peabody's first assignment of error not well-taken.

## B. Speedy Trial

{¶ 59} In his second assignment of error, Peabody argues that the trial court erred when it denied his motion to dismiss for violation of his right to a speedy trial as guaranteed by the Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution. The state responds that Peabody was not being held solely on the charges in this case, thus triple-count provisions of R.C. 2945.71(E) did not apply, and it emphasizes that most delays were not chargeable to the state due to tolling events.

{¶ 60} The Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution grant an accused the right to a speedy trial. *State v. Martin*, 156 Ohio St.3d 503, 2019-Ohio-2010, 129 N.E.3d 437. This right is also codified in R.C. 2945.71, et seq. *Id.* Under R.C. 2945.71(C)(2), "[a] person against whom a charge of

24.

felony is pending * * * shall be brought to trial within two hundred seventy days after the person's arrest." Under R.C. 2945.71(E), for purposes of computing such time, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.72 sets forth circumstances in which the period for bringing an accused to trial may be extended. They include:

(A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against the accused, within or outside the state, by reason of confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure availability of the accused;

* * *

(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon the accused's request as required by law;

(D) Any period of delay occasioned by the neglect or improper act of the accused;

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

* * *

(G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order;

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]

\* \* \*

{¶ 61} When reviewing a speedy trial issue, we must "count the days of delay chargeable to either side and determine whether the case was tried within the time limits pursuant to R.C. 2945.71." *State v. Hopkins*, 7th Dist. Mahoning No. 11 MA 107, 2012-Ohio-3003, ¶ 12, citing *State v. Sanchez,* 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 8. A trial court's decision denying a motion to dismiss based upon a violation of the speedy trial provisions presents a mixed question of law and fact. *State v. Beal*, 2021-Ohio-3812, 179 N.E.3d 754, ¶ 20 (5th Dist.). We accept as true any facts found by the trial court so long as they are supported by competent, credible evidence, but we review legal issues *de novo*. *Id.*

{¶ 62} Rather than recite the parties' arguments, we will construct our own timeline and consider the parties' pertinent arguments in determining whether Peabody's right to a speedy-trial was violated. That timeline is as follows:

26.

| Date | Event | Tolling? | # Days | Triple Count? | Total Days |
|---|---|---|---|---|---|
| 11/8/17 | Indictment is filed | | | | |
| 11/13/17 | Judgment entry from court directs sheriff to transport Peabody from Mansfield Correctional Institution | | | | |
| 11/17/17 | Arrest warrant is served at Mansfield Correctional Institution | SPEEDY TRIAL TIME BEGINS TO RUN | | | |
| 11/21/17 | Peabody is arraigned | | 4 | no; incarcerated on another matter | 4 |
| 11/22/17 | Notice to the court indicating that Peabody is presently serving prison sentence | | 1 | no; incarcerated on another matter | 1 |
| 12/12/17 | Judgment entry from the court directs sheriff to transport Peabody from Mansfield Correctional Institution for 1/9/18 PT | | 20 | no; incarcerated on another matter | 20 |
| 1/2/18 | Peabody released from Mansfield Correctional Institution and taken to Erie County jail | | 21 | no; incarcerated on another matter | 21 |
| 1/9/18 | Defense counsel failed to appear for 1/9/18 PT | Yes, time tolled until 2/13/18 court date | 7 | Yes; completed other sentence 1/2/18 | 21 |
| 1/17/18 | Peabody is released from jail | Yes (see above) | 0 | | 0 |

27.

| | | | | |
|---|---|---|---|---|
| 2/13/18 | Defendant's motion for continuance and waiver of speedy trial till next court date | Yes, time tolled until 4/3/18 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 4/2/18 | Scheduling conflict of court | Yes, time tolled until 4/10/18 (R.C. 2945.72(H)) | 0 | | 0 |
| 4/10/18 | Defendant's motion for continuance and waiver of speedy trial till next court date | Yes, time tolled until 4/24/18 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 4/24/18 | Pretrial; bond revoked for failure to appear | Yes; improper conduct of defendant (R.C. 2945.72(D)) | 0 | | 0 |
| 4/26/18 | Bench warrant | Yes; improper conduct of defendant (R.C. 2945.72(D)) | 0 | | 0 |
| 10/19/18 | Peabody is arrested | Yes; improper conduct of defendant (R.C. 2945.72(D)) | 0 | | 0 |
| 10/23/2018 | Defendant's motion for continuance | Yes, time tolled until 11/20/18 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 11/20/18 | Defendant's motion for continuance and waiver of speedy trial till next court date | Yes, time tolled until 1/8/19 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 1/8/19 | Defendant's motion for continuance and waiver of speedy trial till next court date | Yes, time tolled until 2/26/19 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 2/26/19 | Defendant's motion for continuance and waiver of speedy trial | Yes, time tolled until 3/19/19 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 3/6/19 | Peabody is released from jail | Yes (see above) | 0 | | 0 |
| 3/19/19 | Defendant's motion for continuance and waiver of speedy trial till next court date | Yes, time tolled until 5/7/19 court date (R.C. 2945.72(H)) | 0 | | 0 |

28.

| 5/7/19 | Defendant's motion for continuance | Yes, time tolled until 7/8/19 jury trial (R.C. 2945.72(H)) | 0 | | 0 |
| 6/13/19 | Defense counsel's motion to withdraw | Yes (see above) | 0 | | 0 |
| 6/14/19 | Bench warrant issued | Yes (see above); also improper conduct of defendant (R.C. 2945.72(D)) | 0 | | 0 |
| 6/25/21 | Arrested in Arizona; held on Erie County case Nos. 2017-CR-0487; 2018-CR-0042; 2018-CR-0477 | Yes. On 5/7/19, Peabody waived speedy trial until 7/8/19 jury trial, but left jurisdiction in the meantime. Next post-arrest court date scheduled for 7/27/21. | 0 | | 0 |
| 7/26/2021 | Defendant's motion for continuance | Yes, time tolled until 9/7/21 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 9/8/21 | Defendant's motion for continuance | Yes, time tolled until 11/2/21 court date (R.C. 2945.72(H)) | 0 | | 0 |
| 11/2/21 | Defendant's motion for continuance and speedy trial waiver until next court date | Yes, time tolled until 1/4/22 court date (R.C. 2945.72(H)) | 0 | | 0 |
| | Covid outbreak at Erie County Jail necessitates continuance of 1/4/22 PT | Yes, time tolled until 1/18/22 (R.C. 2945.72(H)) | 0 | | 0 |
| | Illness of judge necessitates continuance of 1/18/22 PT | Yes, time tolled until 1/25/22 (R.C. 2945.72(H)) | 0 | | 0 |
| 1/25/22 | Defendant's motion for continuance | Yes, time tolled until 2/22/22 (R.C. 2945.72(H)) | 0 | | 0 |

29.

| | | | | | |
|---|---|---|---|---|---|
| 2/22/22 | Defendant's motion for continuance | Yes, time tolled until 6/27/22 (R.C. 2945.72(H)) | 0 | | 0 |
| 6/27/22 | Jury Trial | | 0 | | 0 |
| **TOTAL DAYS** | | | | | 67 |

{¶ 63} R.C. 2945.72(H) provides that the period for bringing an accused to trial may be extended for a "period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." Most of the continuances described above resulted from defense motions. There were three short continuances necessitated by other circumstances: (1) a scheduling conflict of the trial court required an eight-day continuance; (2) a Covid outbreak at the jail required a two-week continuance; and (3) the trial judge's illness required a one-week continuance.

{¶ 64} "'[A] trial court may continue a trial date without violating a defendant's right to a speedy trial if the purpose and length of the continuance are reasonable.'" *State v. Stoddard*, 2020-Ohio-893, 152 N.E.3d 990, ¶ 14 (9th Dist.), quoting *State v. Brewer*, 9th Dist. Lorain No. 14CA010608, 2016-Ohio-5366, ¶ 10. A sua sponte continuance must be accompanied by a journal entry explaining the reason for the continuance. *Id.*

{¶ 65} Ohio courts have recognized that a scheduling conflict may be a reasonable purpose for a continuance. *Id.; State v. Glass*, 3d Dist. Auglaize No. 2-04-01, 2004-Ohio-4402, ¶ 11. Additionally, the Ohio Supreme Court has recognized that trial courts may continue trials for defendants on a case-by-case basis as needed to prevent the spread

30.

of the coronavirus.  *In re Disqualification of Fleegle,* 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, citing 2020 Ohio Atty.Gen.Ops. No. 2020-002.

{¶ 66} Here, the journal entries reflect the reasons for the continuances.  The trial court granted short continuances due to illness, a scheduling conflict, and a Covid outbreak at the jail.  The purpose and length of the continuances were reasonable.

{¶ 67} R.C. 2945.72(D) also provides that the period for bringing an accused to trial may be extended for a "[a]ny period of delay occasioned by the neglect or improper act of the accused."  Here, additional continuances were necessitated by Peabody's own failure to appear and his departure from the jurisdiction.  These circumstances tolled the speedy-trial clock.  *See State v. Bauer*, 61 Ohio St.2d 83, 84, 399 N.E.2d 555, 556 (1980) ("[A] defendant who fails to appear at a scheduled trial, and whose trial must therefore be rescheduled for a later date, waives his right to assert the provisions of R.C. 2945.71 through 2945.73 for that period of time which elapses from his initial arrest to the date he is subsequently rearrested.).

{¶ 68} As for application of the triple-count provision of R.C. 2945.71(E), this provision "applies *only* to those defendants who are held in jail in lieu of bail *solely* on the pending charge."  (Emphasis in original.)  *State v. Burrows,* 8th Dist. Cuyahoga No. 54153, 1988 WL 12981, *3 (Feb. 11, 1988).  *See also State v. Harris*, 6th Dist. Huron No. H-99-010, 2000 WL 731374, *7 (Jun. 9, 2000).  The record demonstrates that Peabody was incarcerated on another matter for the period of his arrest on November 17,

31.

2017, through January 2, 2018, therefore, he is not entitled to the benefit of the three-for-one provision for those days. The only period for which the triple-count provision applies was January 2, 2018, to January 9, 2018. All other time that Peabody spent in jail solely on this charge has been charged to him under R.C. 2945.72(D) and (H).

{¶ 69} The trial court did not err in denying Peabody's motion to dismiss for violation of his right to a speedy trial. We find Peabody's second assignment of error not well-taken.

## C. Ineffective Assistance of Counsel

{¶ 70} In his third assignment of error, Peabody argues that although Green-Burton testified that he had a 2017 felony conviction in Michigan for a home invasion, a felony conviction in West Virginia for possession of crack cocaine and heroin, and a conviction related to the present case, Green-Burton had numerous additional convictions about which trial counsel failed to cross-examine him. Peabody maintains that trial counsel was ineffective for failing to do so, and he insists that if he had done so, it would have emphasized Green-Burton's incentive to cooperate with the state, it would have made clear that Green-Burton specifically lied at trial when he said that the Michigan, West Virginia, and present case were his only prior felony convictions, and the jury would have found Green-Burton's testimony less credible. Peabody urges that Green-Burton's testimony was crucial to the state's case because it was the only evidence that Green-Burton had an arrangement to sell drugs to Peabody, the testimony linked Peabody

32.

to the contents of the hotel room, and there had been little other testimony that Peabody had been present in the hotel room where the drugs and other items had been found.

{¶ 71} The state responds that Peabody offers no evidence that Green-Burton had criminal offenses beyond what he admitted at trial. Although trial counsel made a reference to Green-Burton's "extensive criminal history," the record contains nothing more on the topic. Additionally, the state emphasizes that it was clear to the jury that Green-Burton is not a law-abiding citizen and that he had made a deal with the state to testify against Peabody. It insists that Peabody has not demonstrated that there was a reasonable probability of a different outcome had trial counsel cross-examined Green-Burton about additional prior convictions.

{¶ 72} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A

33.

reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 73} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 74} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 11th Dist. Ashtabula No. 2003-A-0076, 2005-Ohio-3775, ¶ 8, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160, 542 N.E.2d 707 (1988).

{¶ 75} After Green-Burton testified, defense counsel indicated his desire to recall him to the stand to reexamine him because "it turns out he has a fairly extensive criminal

history." The court asked the state for its response, and the attorney for the state said that she had given the defense a copy of Green-Burton's computerized criminal history ("CCH") and the only things on it were the convictions about which he testified. The court then asked defense counsel if he had the CCH that morning, during Green-Burton's testimony. Defense counsel said yes, but explained that he "did not have access to get a certified copy." Because defense counsel had the document at the time Green-Burton testified, the court denied his request to recall the witness.

{¶ 76} In *State v. Anderson*, 4th Dist. Lawrence No. 17CA6, 2018-Ohio-2013, ¶ 34, appellant argued that his attorney was ineffective for failing to cross-examine a witness more thoroughly about her criminal history. The court rejected this argument, reasoning that it could not conclude that "more specific details regarding [the witness's] criminal history would have led the jury to wholly discredit [her] testimony such that the outcome of appellant's trial would have been different." *Id.* It noted that the defendant had not suggested what further probing of the witness's criminal past would have revealed and emphasized that appellant could only speculate that additional evidence regarding the witness's criminal past would have led the jury to acquit him. The court also recognized that "[t]he jury was well-aware that [the witness] had not been a law-abiding citizen;" she had been cross-examined about "her criminal history, her drug use, and her motivation to become a confidential informant;" she admitted that she had prior criminal charges involving dishonesty, that she had abused drugs, that she had overdosed,

and that after her overdose, she became a CI; and counsel had elicited evidence implying that she had implicated the defendant because of a romantic tiff.

{¶ 77} Like *Anderson,* the jury here was well aware that Green-Burton had felony convictions and had been selling drugs for at least a year before his arrest in this case. It also understood that Green-Burton's cooperation had been rewarded greatly by a likely reduction of his 41-month prison term to a six-month stay in a treatment facility. And like *Anderson,* there is nothing in the record specifying what other criminal convictions existed and whether additional purported convictions—or his failure to disclose such convictions on direct examination—would have discredited him any more seriously than the convictions that he did disclose. As such, we cannot say that there was a reasonable probability that the outcome of the trial would have been different had defense counsel cross-examined Green-Burton more thoroughly about his criminal history.

{¶ 78} Peabody attempts to distinguish *Anderson* by arguing that counsel in *Anderson* failed to obtain details of the witness's criminal history before trial, whereas defense counsel here had a copy of the criminal history at the time Green-Burton testified. He emphasizes that counsel sought to subpoena Green-Burton as a rebuttal witness, but the court would not allow it. While this may have some bearing in evaluating the advisability of counsel's trial strategy (if we were inclined to evaluate counsel's trial strategy), we fail to see how this distinction impacts our conclusion concerning the reasonable probability of a different outcome.

36.

**{¶ 79}** Finally, Peabody insists that "[r]evealing Green-Burton's full criminal history would have led to Peabody's acquittal" because "[t]he jury would have had much more rationale to discredit his testimony, which was critical to the State's case." This is purely speculative. Green-Burton's testimony was consistent with Schultz's testimony. Schultz testified that Peabody told her that Green-Burton would be providing drugs and that he would be selling it. Schultz knew that Peabody and Green-Burton originally planned to sell drugs out of L.G.'s house and that they were forced to settle on the hotel room. She testified about Peabody's efforts—his calls and texts—to sell the product that Green-Burton had admittedly provided. Given that Schultz and Green-Burton's testimony was entirely consistent, it is unlikely that a jury would have found Green-Burton less credible if it had known that he had a longer or more serious criminal history, or if it had been advised that Green-Burton underrepresented the extent of his criminal history.

**{¶ 80}** We find Peabody's third assignment of error not well-taken.

### D. Jury Instruction

**{¶ 81}** In his fourth assignment of error, Peabody argues that the trial court abused its discretion when it included a jury instruction on consciousness of guilt. He urges that he had been living with his father-in-law in Arizona "in plain sight," and there was no evidence that he took steps to conceal himself or his identity or evade capture while in

37.

Arizona. He also maintains that there was no evidence as to how or why he went to Arizona or that he went to Arizona to flee authorities.

{¶ 82} The state responds that the jury instruction was a correct statement of the law and was appropriate under the facts of the case. Specifically, it highlights the testimony of Deputy Henderson, who testified that on June 14, 2019, the trial court issued a warrant because Peabody violated bond. At that time, a jury trial had been scheduled for July 8, 2019. The bench warrant was not executed until June 25, 2021, at which time it was discovered that Peabody was incarcerated in Yuma, Arizona, for a new drug offense. The state insists that reasonable minds could conclude that Peabody's leaving the state before his scheduled trial date was an attempt to evade justice and was indicative of consciousness of guilt. Finally, the state maintains that the evidence of guilt was overwhelming, therefore, even if the trial court erred in giving the instruction, any such error was harmless.

{¶ 83} Trial courts are charged with giving juries correct and comprehensive instructions that adequately reflect the argued issues in the given case before them. *State v. Sneed,* 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992). "Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction." *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 40, citing *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d 585, 591,

38.

575 N.E.2d 828 (1991). We review the trial court's instructions to the jury for an abuse of discretion. *State v. White,* 2013-Ohio-51, 988 N.E.2d 595, ¶ 97 (6th Dist.), citing *State v. Lillo,* 6th Dist. Huron No. H-10-001, 2010-Ohio-6221, ¶ 15. In doing so, we review the instructions as a whole to determine whether or not the jury was likely misled in a matter materially affecting the substantial rights of the party who claims error. *Miller* at ¶ 40, citing *Becker v. Lake Cty. Mem. Hosp. West,* 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

{¶ 84} Evidence of flight is admissible as evidence of consciousness of guilt. *State v. Williams,* 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). "Flight means some escape or affirmative attempt to avoid apprehension." (Internal quotations omitted.) *State v. Herrell,* 6th Dist. Lucas No. L-16-1173, 2017-Ohio-7109, ¶ 24, quoting *State v. Wesley,* 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19, citing *United States v. Felix–Gutierrez,* 940 F.2d 1200, 1207 (9th Cir.1991). To constitute "flight," the defendant must "appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." *State v. Sanchez-Sanchez,* 2022-Ohio-4080, 201 N.E.3d 323, ¶ 177 (8th Dist.), *appeal not allowed,* 169 Ohio St.3d 1458, 2023-Ohio-758, 204 N.E.3d 569. Flight need not be immediate. *State v. White,* 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 48 (2d Dist.). "The instruction may be appropriate when the defendant, a long-time resident of the area in which the crime occurred, was arrested months later in another state or another part of this state." *Id.*

39.

**{¶ 85}** The trial court instructed the jury as follows:

Testimony has been admitted indicating that the Defendant fled from the jurisdiction of the Court. You are instructed that the Defendant fleeing from the jurisdiction alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness or awareness of guilt. If you find that the facts do not support that the Defendant fled the jurisdiction, or if you find that some other motive prompted the Defendant's conduct, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the Defendant engaged in such conduct, and if you decide that the Defendant was motivated by a consciousness or awareness of guilt, you may, but are not required to, consider the evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

**{¶ 86}** Here, Peabody was arrested on February 27, 2017. He was indicted on November 8, 2017, and appeared for arraignment on November 21, 2017. Discovery was proceeding, pretrials were scheduled, and motions were filed. An April 26, 2018 bench warrant was issued, and he was arrested on that warrant six months later. A jury trial was set for July 8, 2019. But the court was forced to issue another bench warrant on June 14,

2019, and deputies did not succeed in arresting Peabody until June 25, 2021, at which time it was discovered that Peabody was in Arizona, incarcerated on another case. Peabody offered no evidence suggesting an alternative motivation for his departure from the jurisdiction. It could properly be inferred that Peabody's travel to Arizona—when he knew he had been indicted, prosecution was active, and a jury trial had been set—was an attempt to flee from justice. The trial court did not err in instructing the jury on consciousness of guilt.

{¶ 87} We find Peabody's fourth assignment of error not well-taken.

### E. Consecutive Sentences

{¶ 88} The trial court ordered that Peabody serve the sentences imposed for Counts 1, 2, and 7 concurrently with each other, but consecutively with the sentence imposed for Count 6. In his fifth assignment of error, Peabody argues that the trial court imposed consecutive sentences without making sufficient findings required under R.C. 2919.14(C)(4). In particular, he maintains that at the sentencing hearing, the trial court failed to find that consecutive sentences were not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Moreover, he insists that none of the requisite findings are set forth in the sentencing entry, therefore, the matter must be remanded for resentencing.

{¶ 89} The state agrees with Peabody that the court failed to make the finding that consecutive sentences were not disproportionate to the seriousness of the offender's

41.

conduct and to the danger the offender poses to the public, and that it failed to incorporate the R.C. 2919.14(C)(4) findings into its sentencing entry. It argues that the matter should be remanded to the trial court for a new sentencing hearing.

{¶ 90} Under R.C. 2929.14(C)(4), where a trial court imposes multiple prison terms for convictions of multiple offenses, it may require the offender to serve the prison terms consecutively if it finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and if it also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that

consecutive sentences are necessary to protect the public from future crime

by the offender.

{¶ 91} "[T]he trial court must make the requisite findings *both* at the sentencing

hearing and in the sentencing entry." (Emphasis in original.) *State v. Beasley*, 158 Ohio

St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 253, citing *State v. Bonnell*, 140 Ohio

St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. While "a word-for-word recitation of

the language of the statute is not required," a reviewing court must be able to discern that

the trial court engaged in the correct analysis and the record must contain evidence to

support the trial court's findings. *Bonnell* at ¶ 29.

{¶ 92} At the sentencing hearing, the trial court provided the following rationale

for imposing consecutive sentences:

The Court finds consecutive service is necessary because the crimes

were committed while awaiting sentencing, trial, under sanction, under post

release control. The harm is so great or unusual that a single term does not

adequately reflect the seriousness of the conduct, but, more importantly

offender's criminal history shows that consecutive terms are needed to

protect the public.

{¶ 93} The parties are correct that the trial court failed to find that

consecutive service is necessary to protect the public from future crime or to punish the

43.

offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The parties are also correct that the findings the trial court made were not incorporated into its judgment entry. We, therefore, agree that this matter must be remanded so that the trial court can make the necessary findings and issue a judgment entry incorporating its findings.

{¶ 94} We find Peabody's fifth assignment of error well-taken.

### III.    Conclusion

{¶ 95} Peabody's convictions were not against the manifest weight of the evidence. Peabody was convicted under theories of complicity or constructive possession, therefore, it was not necessary that he be in actual possession of the crack cocaine and heroin that was found in the hotel room. The fact that the jury found Green-Burton and Schultz to be credible does not render the convictions against the manifest weight of the evidence. The state was not required to produce fingerprint evidence, the content of cell phones, or GPS data. And Peabody could be found to have possessed the items found in his father's vehicle—even the items found in the air vent—because he was driving the vehicle and exercised dominion and control over the vehicle and its contents. It was the role of the jury to weigh the evidence and make credibility determinations. This is not the exceptional case where the evidence weighs heavily against conviction. We find Peabody's first assignment of error not well-taken.

44.

{¶ 96} Peabody's right to a speedy trial was not violated. Most of the delays that occurred in this case were chargeable to Peabody because he sought continuances or engaged in improper conduct, such as failing to appear at trial or leaving the jurisdiction despite a scheduled jury trial. Triple-count provisions did not apply while he was incarcerated on other matters. We find Peabody's second assignment of error not well-taken.

{¶ 97} Trial counsel was not ineffective for failing to cross-examine Green-Burton more thoroughly as to his criminal record. The jury was already aware that Green-Burton was a convicted felon who had been selling drugs for at least a year before his arrest in this case and had been rewarded for cooperating with the state. We cannot say that there was a reasonable probability that the outcome of the trial would have been different had defense counsel cross-examined Green-Burton more thoroughly about his criminal history, especially given that there was nothing in the record specifying what criminal convictions existed. We find Peabody's third assignment of error not well-taken.

{¶ 98} The trial court did not abuse its discretion when it instructed the jury on consciousness of guilt. There was evidence in the record that Peabody went to Arizona after he was indicted and after the court had scheduled a jury trial and that the court issued a bench warrant for his arrest. Reasonable minds could conclude that Peabody's leaving the state before his scheduled trial date was an attempt to evade justice and was

45.

indicative of consciousness of guilt. We find his fourth assignment of error not well-taken.

{¶ 99} The parties agree that at the sentencing hearing, the trial court failed to make all findings necessary under R.C. 2929.14(C)(4) before imposing consecutive sentences and that it failed to incorporate its R.C. 2929.14(C)(4) findings into the sentencing entry. We find Peabody's fifth assignment of error well-taken. We remand this matter to the trial court so that it can consider whether consecutive sentences should be imposed under R.C. 2929.14(C)(4) and for it to incorporate any such findings into its sentencing entry.

{¶ 100} We affirm, in part, and reverse, in part, the September 6, 2022 judgment of the Erie County Court of Common Pleas. The parties are ordered to share the costs of this appeal under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.